Sneed, J.,
delivered the opinion of the Court.
Tbe plaintiffs were commission merchants and cotton factors in the city of Memphis in 1865, and brought this action to recover of defendant an account of certain monies advanced to him, and for charges upon three bales of cotton consigned to them by defendant on the 31st January of that year, which were sold in the city of New York on the 3rd of May thereafter for a less sum than the amount originally advanced by the plaintiffs. The action was brought to recover the difference between the sum advanced by the plaintiffs and that for which the cotton was actually sold.
The plaintiffs had a verdict and judgment below for $398.80, from which the defendant has appealed in error. The defense relied upon is, that the loss *139 accrued in consequence of the violation by the plaintiffs of the positive instructions of the defendants in reference to the disposition and sale of the cotton. It appears in proof that on the 31st of January, 1865, the defendant brought and delivered to the plaintiffs three bales of cotton, to be sold at once in the Memphis market. The plaintiffs thereupon informed defendant of the existence of an order from the authorities of the United States Government, then engaged in the late civil war with the Southern States,, which forbade the sale of cotton in the city of Memphis, and advised its immediate shipment for sale in Cincinnati, where no such restriction existed. The defendant agreed to the shipment and sale, and the plaintiffs thereupon advanced to the defendant about the sum of sixty cents per pound upon the cotton,, amounting in the aggregate to $600, and including all charges and commissions, to $670.
The contract and agreement between the parties was, that the cotton was to be shipped at once to Cincinnati, and to be sold “upon arrival.” The instructions given by the defendant to the plaintiffs touching said shipment and sale were peremptory, and, left to the latter no sort of discretion. Upon this point the proof is clear and without conflict. The plaintiffs executed and delivered to the defendant a receipt for the cotton in words and figures as follows:
“Received of J. W. Strong three bales of cotton,, which we have shipped to Cincinnati for him.
“ January 31st, 1865. W. L. Stewart & Bro.”
*140 On the margin of this receipt was written tbe weight of the three bales, aggregating 1,553 pounds. It was shown in proof that it required about five or six days to transport cotton at that time from Memphis to Cincinnati, and that the market price for cotton in the latter city, through the month of February, and up to the 8th of March, ranged from seventy to seventy-five cents per pound, and in New York daring the same months from seventy-five to eighty cents per pound. After the 8th of March the cotton market in Cincinnati began to decline, and ranged during that month from thirty-five to fifty-five cents per pound, owing to what’ is termed, by the Cincinnati witnesses, the “peace panic,” produced by the frequent military reverses to the Southern armies, opening a prospect for the early extradition of the- cotton supply then held and hoarded within the military lines of the cotton States. About twenty days after the delivery of the cotton to the plaintiffs, the defendant came to Memphis and called upon the plaintiffs for an account of sales and settlement. He was surprised to learn that nothing had been heard from the cotton, and was told by the plaintiffs that “their agents5’ in Cincinnati, Messrs. Buchanan & Son, to whom, the cotton had been shipped, “had disobeyed instructions.55 The plaintiffs thereupon promised the defendant to write “again55 to “their agents,55 and instruct them to sell the cotton.
Up to this time there is no proof whatever that the plaintiffs have ever given their agents at Cincinnati any instructions as to the sale of the cotton: *141 and, indeed, no proof upon the subject, except the inference to be drawn from the following letter from Buchanan & Son, produced in evidence by the plaintiffs;
CINCINNATI, March 9, 1865.
Messes. W. L. Stewart & Bro. — Bear Sirs: We bave received your letter of the 1st inst. directing us to sell your cotton. This shall be done' as soon as possible, but there is scarcely any demand for it at present. Last sales 70 to 71. Very truly,
R. Buchanan & Son.
It would seem, in the absence of all proof upon tbe subject, and from the fact that this letter .makes no reference to any previous instructions, that the instructions in the plaintiffs’ letter of the first of March were the first ever given to their agents to sell the defendant’s cotton. But the deposition of the elder Buchanan is taken in the cause, which seems to leave no doubt upon the subject. He is not interrogated upon that point, but is silent upon it. He is examined, however, upon the state of the cotton market in Cincinnati, and in the course of his examination he says:
“I sold no cotton in February or March, 1865. What I held was limited by the owner at above the market price.”
We take it from the proof, therefore, as an inference not only legitimate, but irresistable, that the agents of the plaintiffs had possession of the defendant’s cotton for more than one month without the instructions so peremptorily imposed by the defendant upon tlm *142 plaintiffs, that the same should be sold “at once upon arrival” and at a time when, according to the proof, it might have brought a price more than sufficient to have reimbursed all advances. The cotton was not sold in Cincinnati, but in view of the downward tendency of the market after the above correspondence, was eventually shipped by Buchanan & Son, without the consent of defendant, to- Messrs. Baker & Co., of New York, who sold it for account of Buchanan & Son, the consignors, on the 3rd of May thereafter, at thirty-one and three-quarter cents per pound. And it is for this deficit, and under these circumstances, that the plaintiffs have brought their action, and have recovered what they claim, including the expensed of reshipment and sale in the city of New York. The plaintiffs proved upon the trial that Messrs R. Buchanan & Son were good merchants, and faithful and efficient factors; and they also produced in evidence, over the objections of the defendant, a paper signed by defendant and others, and of a date subsequent to the beginning of this litigation, purporting on its face to be “compromise and settlement of the matters involved in this controversy, giving the defendant four days from its date to pay a certain sum of money in compromise, or upon his failure to do so, imposing a forfeiture of all advantages under it. The defendant saw proper to accept the latter alternative, and to risk his rights upon a continued litigation.
"We think this paper was irrelevant, and calculated to mislead the jury, and that the same was improperly admitted in evidence. It is a mere basis of a *143 compromise which had been abandoned by both parties, and which the defendant had, by its express terms, a right to abandon after four days from its execution. It contained no such admission of a fact, as could be shown in evidence by the party making it; nor was it the acknowledgement of an absolute debt, which could have been enforced against the defendant. The action was still pending, and the mere option was given the defendant of putting an end to it or not, as he ’ chose. The fact that the attorney had agreed that the paper should be read, subject to exceptions for competency and relevancy, did not make it evidence.
It was utterly irrelevant to the issues to be tried and should have been excluded from the jury upon objection. The law favors the compromise of matters in litigations. It is against the policy of the law that parties should be prejudiced by their “bids for peace,” or overtures, or agreements, made with a view to stop litigation. These overtures of pacification are protected in the law as confidential and privileged matter, which are to be encouraged and promoted. “Without this protection rule,” it is said, “it would often be difficult to take any step toward an amicable compromise or adjustment.” 1 Greenl. Ev., Sec. 192. It must be permitted to men, said Lord Mansfield, to buy their peace without prejudice to them; if the offer should not succeed; and such offers are made to stop litigation without regard to the question whether any thing is due or not. If, therefore, the defendant being sued for £100, should offer the plain *144 tiff ¿£20, tbis is not admissible in evidence, for it is irrelevant to the issue; it neither admits nor ascertains any debt, and is no more than saying he would give £20 to be rid of the action. I Bull N. P. 230; Gregory v. Howard, 3 Esp., 113; Marsh v. Gold, 2 Pick., 290; Gerrish v. Sweetser, 4 Pick., 374, 377; Wayman v. Hilliard, 7 Bing., 101; Cummings v. French, 2 Campb., 106. The court below charged the jury in reference to this paper, that it was “a solemn admission by the defendant, and binding upon him.” . This was a serious error in the state of the proof, and would naturally decoy the minds of an ordinary jury from a proper consideration of the real questions at issue. In the general charge, the court said to the jury: “If you find from the proof that the plaintiffs had disobeyed positive instructions from the defendant in regard to the sale of his cotton, you will look to the proof to see how much the defendant bad been damaged by reason of such default, and must find for defendant the amount of his said damages; but if you find from the proof that plaintiffs were merely the shipping agents of defendant to ship his cotton to Cincinnati, although the defendant had not directed to whom it should be shipped; and you find further that plaintiffs had shipped the cotton to a prompt, reliable factor at Cincinnati, and further, that said factor has violated positive instructions from plaintiffs in selling the cotton, by reason of which the cotton did not sell for as much as it would have done if sold according to said instructions from plaintiffs; still the plaintiffs would not be liable *145 to defendant for the damage sustained on account of the breach of instructions on the part of the Cincinnati factor, but that the latter would be. That if the defendant instructed the p'laiútiffs to ship the cotton to Cincinnati to be sold for him, and plaintiffs so shipped it, this would constitute the plaintiffs merely shipping agents, and they would not be liable to defendant for default of R. Buchanan & Son, to whom it was shipped, if the jury believe that said Buchanan & Son were prompt,' reliable, and responsible persons.”
The defendant requested the court to charge the' jury that they might look to the proof to determine' whether or not R. Buchanan & Son were the agents of plaintiffs, that if they found that they were theagents of plaintiffs, and not of defendant, the plaintiffs would be liable to defendant for the failure of R. Buchanan & Son to carry out the instructions given by defendant to plaintiffs in regard to the sale of the cotton.
To this request the Judge responded that he had already charged sufficiently upon that point. The defendant thereupon requested the court to charge that if the jury found from the proof that defendant gave plaintiffs positive instructions to send the cotton to Cincinnati and sell it at that place on arrival, and they further found that the cotton was sent -to New York from i Cincinnati, that the defendant would not be chargeable with the expense of shipping the cotton from Cincinnati to New York, or with the charges and commissions of the factor selling it there. The court declined to give these instructions to the jury.
*146 The errors of the charge of the court, as actually given to the jury are, that the court' assumes that it is proven that -the plaintiffs were the mere agents for the shipment of the defendant’s cotton, and that they had nothing whatever to do with the sale. Or if it cannot be correctly said that the court has assumed the fact to be proven, it is nevertheless apparent that the court so framed the charge upon this subject as to leave that impression upon the minds of the jury. Another error consists in the fact that the charge totally ignores the important principle that in this case it devolved upon the plaintiffs to show that in undertaking the shipment of defendant’s cotton, and its sale in another market by an agent of their own selection, they had promptly and faithfully imparted to said agent the identical instructions and restrictions which the defendant had given to and imposed upon them.
We are of opinion also that the court erred in withholding the instructions asked for by the defendant. It was certainly a question to be gathered from the proof whether the plaintiffs were the mere agents of defendant for shipment/ or his agents for shipment and sale also, and this was a matter easily ascertained from the contract between the parties. And it would be a harsh doctrine which, it seems to us, would be subversive of the fundamental principles upon which the law of agency rests, that would authorize an agent to recover of a principal losses and charges which accrued to the agent on account of a positive abuse and violation of the duties and obligations of his agency, lit is manifest that the charge proceeds upon the idea *147 that tbe plaintiffs bad a right in this kind of a case to appoint a sub-agent, and that such being the usage of trade, the law would imply in such a case a privity between the principal and the sub-agent; and this being so it would only be necessary for the plaintiffs to establish that the sub-agent was a person of known and accredited integrity and skill in the business for which he was selected. This doctrine may be applicable to cases when there is mere unskillfulness in the performance of an agency, or an unwise or incautious exercise of discretion. But in the case before us there was absolutely no discretion in the agent, and there could be none reposed in the sub-agent beyond a sale of the cotton in Cincinnati at once “upon its arrival” there.
Here we have not only a failure to carry out the specific trust imposed, but an unauthorized breach of the trust, and a departure from its sanctions, which nothing less than an unlimited discretion could justify. It is certainly true that an agent employed to do a particular service may resort to the usual and necessary means to make his agency effective. 1 Sneed, 497. A factor may thus appoint another to sell merchandize consigned to him for sale, and such being the usage of trade, a privity is created between the latter and the principal to the precise extent and scope of authority vested in the first factor, but no further. That privity is destroyed by any unauthorized perversion or abuse of the original authority; and where the privity does not exist, the second factor would be responsible to his own- employer, and the *148 first would be responsible to the principal. 3 Head, 226; Story Ag., Sec. 14, 201, 217, 387. A mere’ agent 'cannot generally appoint a sub-agent so as to render the latter directly responsible to the principal; Story Ag., Sec. 13; 9 Cooke, 75; 4 Mass., 597. But he may when such is the usage of trade, or is understood by the parties to be the mode in which the particular business might be done. 9 Ves., ch. 234; 3 Johns., ch. 167. And upon such appointment the agent is not responsible for the acts or omissions of the substitute, but the sub-agent would himself be directly responsible to the principal for his own negligence or misconduct. 8 Cow., 198; 1 Ld. Raym., 646; 15 East, 384; 9 Wheat 720; Story Ag., Secs., 201, 217. But an agent cannot thus shift his own-liability by substituting another to do that which is without the' scope of his own authority, or by conferring a discretion upon his substitute that he did not himself possess. The first duty of a factor is' to obey instructions. If he has none, he may then act upon his own sound discretion, according to the usages of trade. He may sell in his own name, and without instructions, he may sell on discretion, as may seem best for his customers; but if he has instrue-tions he must follow them, and if by the usages or necessities of trade he finds it necessary to appoint a substitute, he must be prepared to show that the latter has been invested by by him with no other or further powers than he possessed, and that he has imparted to him fully and exactly the instructions by which his own powers were limited and circumscribed. *149 Without attempting to intimate- an opinion as to the 'merits of the case, we are content to lay down these general principles, which are to govern it upon the new trial, which we feel it to be our duty to award. Let the judgment be reversed, and the cause ‘ remanded 'for a new trial.
The cases of Dunlap v. Stewart & Bro., Wright v. Stewart & Bro., and Futhery v. Stewart & Bro., involving the same questions, are governed by principles of this opinion.
Let the judgments in each of those cases which have been heard and considered with this, be also reversed, and new trials awarded.